Slip Op. 11-49

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                    :
KYD, INC.,                          :
                                    :
            Plaintiff,              :
                                    :        Before:      WALLACH, Judge
        v.                          :        Court No.:   09-00034
                                    :
UNITED STATES,                      :        PUBLIC VERSION
                                    :
            Defendant,              :
                                    :
        and                         :
                                    :
POLYETHYLENE RETAIL CARRIER         :
BAG COMMITTEE, HILEX POLY CO.,      :
LLC, and SUPERBAG CORPORATION,      :
                                    :
            Defendant-Intervenors.  :
_____ :
```

[This matter is REMANDED to the U.S. Department of Commerce for action consistent with this opinion.]


                            Dated:        April 28, 2011


Riggle & Craven (David J. Craven) for Plaintiff KYD, Inc.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Carrie A. Dunsmore and Stephen C. Tosini); and Scott D. McBride, U.S. Department of Commerce, Of Counsel, for Defendant United States.

King & Spalding LLP (Stephen A. Jones and Daniel L. Schneiderman) for Defendant-Intervenors Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

## OPINION

**Wallach, Judge:**

## I
## INTRODUCTION

As a U.S. importer of polyethylene retail carrier bags ("PRCBs") from Thailand, Plaintiff

KYD, Inc. ("KYD") continues its challenge to determinations made by the U.S. Department of

Commerce ("Commerce") in the 2006-07 administrative review of the antidumping duty order

covering these bags.  This challenge is limited to entries of the subject merchandise that were

imported by KYD from King Pac Industrial Co., Ltd. ("King Pac") and Master Packaging Co.,

Ltd. ("Master Packaging") and are covered by this third administrative review ("the entries at

issue").  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

In May 2010, the court remanded the instant action to Commerce. See KYD, Inc. v.

United States, 704 F. Supp. 2d 1323 (CIT 2010) ("KYD II").  Familiarity with KYD II is

presumed.  In September 2010, Commerce issued its Final Results of Redetermination. See Final

Results of Redetermination (Doc. No. 66) ("Redetermination").

Commerce is permitted to select rather than calculate an antidumping duty rate for the

entries at issue.  Furthermore, it may select a rate that is adverse to KYD.  However, that rate

must nonetheless be supported by substantial evidence and otherwise in accordance with law.

Because the particular rate actually selected—122.88 percent—does not satisfy this standard

with respect to the entries at issue, this matter is again REMANDED to Commerce.

## II
## BACKGROUND

KYD commenced the instant action to challenge the final results of Commerce's 2006-07

administrative review of an antidumping duty order covering certain plastic bags imported from

Thailand. <u>See</u> Complaint (Doc. No. 7) at 1; Polyethylene Retail Carrier Bags from Thailand: Final Results and Partial Rescission of Antidumping Duty Administrative Review, 74 Fed. Reg. 2,511, 2,511 (January 15, 2009) ("Final Results"); <u>see generally</u> <u>KYD II</u>, 704 F. Supp. 2d at 1323-27 (describing this third administrative review).

Because two exporters that are unaffiliated with KYD—King Pac and Master Packaging—impeded this administrative review, Commerce used what it calls total adverse facts available ("TAFA") to assign each of these exporters an antidumping duty rate of 122.88 percent. <u>KYD II</u>, 704 F. Supp. 2d at 1326-27.  This TAFA rate had been applied to King Pac in the second administrative review and was the highest transaction-specific rate alleged in the 2003 petition. <u>See</u> <u>id.</u>

In contrast to King Pac and Master Packaging, KYD actively participated in the third administrative review by providing information about its purchases from these exporters. <u>See</u> <u>id.</u> at 1325-26.  Indeed, the record strongly suggests that Master Packaging would not have received any form of adverse facts available ("AFA") rate but for the information volunteered by KYD.

See id.[1]  Nonetheless, Commerce selected 122.88 percent as the assessment rate for KYD's relevant entries. See id. at 1326.

In KYD II, the court held that substantial evidence did not support Commerce's implicit decision to disregard KYD's price information. See id. at 1324.  Commerce had determined the assessment rate for KYD's entries "without regard to the information submitted by KYD even though it made no finding under 19 U.S.C. § 1677e(b) that KYD had failed to cooperate and no finding under 19 U.S.C. § 1677m(e) that it could decline to consider KYD's information." Id. The court therefore remanded the matter to Commerce to "either consider this information in determining an assessment rate for KYD's entries or explain why it can decline to do so pursuant to 19 U.S.C. § 1677m(e)." Id. at 1334.

The court did not resolve KYD's arguments "that the total adverse facts available dumping rate that Commerce selected for King Pac and Master Packaging was improperly corroborated and impermissibly punitive." Id. at 1328 n.6.  Although the court had "previously rejected similar arguments" when it upheld application of the same rate to King Pac in the

---

[1] KYD volunteered information about a relationship between King Pac and Master Packaging, Defendant-Intervenors requested that Commerce examine Master Packaging in light of this information, Commerce added Master Packaging as an additional mandatory respondent, and Commerce applied a TAFA rate to Master Packaging for failure to cooperate in that examination. See KYD II, 704 F. Supp. 2d at 1325-26.  Commerce has not explicitly stated that it examined Master Packaging because of KYD's information. See infra Part IV.D.1.  The closest that Commerce comes is in the Redetermination. See Redetermination at 1-2 ("The petitioners claimed that KYD's submission . . . raised serious new issues that the petitioners did not expect and urged the Department to investigate the relationship between King Pac and Master Packaging.  The Department added Master Packaging as an additional respondent that it would examine individually in the review on March 27, 2008.") (internal footnote omitted).  At oral argument, counsel for Commerce stated that the selection of Master Packaging was not in response to the request by Defendant-Intervenors. February 9, 2011 Oral Argument at 11:13:59-11:14:55 ("This is a shorthand version of what happened actually.  During the context of the review, domestics did bring up to us the fact that Master Packaging had essentially been involved in this.  Then it came to the point where we did have time and we did have the ability to review one more company.  And it was decided at that point; however, it was not in response to the fact that the parties had [asked us] to look at this.  It was more a matter of, the fact is, we did have the time to look at one other one, and Master Packaging was on the list of those that had exported during the period of review and they had significant exports too.  So it made sense that since we did have the time, essentially killing two birds with one stone.  But it was not because they had requested that, and we had made that very clear.  It was on the record, and we made it very clear.  We were not doing it because they requested it, but because we had the resources to review them. . . .  Whenever we do response selection it's always based on the resources available to the agency, so at that time we determined we did have the resources to review them.").

second administrative review, it acknowledged that "[r]eassessment of these arguments may be

appropriate in light of" Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319 (Fed. Cir.

2010) (vacating and remanding Gallant Ocean (Thailand) Co. v. United States, 602 F. Supp. 2d

1337 (Wallach, J.)). Id.  Three weeks after KYD II, the Federal Circuit affirmed the court's

decision concerning that second administrative review. See KYD, Inc. v. United States, 607 F.3d

760 (Fed. Cir. 2010) (affirming KYD, Inc. v. United States, 613 F. Supp. 2d 1371 (CIT 2009))

(collectively "KYD I"); see also infra Part IV.D.

On remand, Commerce explained why it declined to use KYD's information to calculate

dumping margins, see Redetermination at 4-9, and took issue with the court's statement of

relevant antidumping law, see id. at 3, 9-10, 15-16, 18, 20-21, 22, 23-24.  In particular,

Commerce reiterated its position that "the antidumping duty statute does not require, or even

contemplate, the Department calculating separate dumping margins for individual importers." Id.

at 3; see also infra Parts IV.A-B.

## III
## STANDARD OF REVIEW

The court will hold unlawful a determination by Commerce resulting from an

administrative review of an antidumping duty order if that determination is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i); see 19 U.S.C. § 1516a(a)(2)(B)(iii).

A determination is supported by substantial evidence if the record contains "evidence that

a reasonable mind might accept as adequate to support a conclusion." Cleo Inc. v. United States,

501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474,

477, 71 S. Ct. 456, 95 L. Ed. 456 (1951)).  Such evidence must be "more than a mere scintilla."

Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1321 (Fed. Cir. 2010)

(quoting Ningbo Dafa Chem. Fiber Co. v. United States, 580 F.3d 1247, 1253 (Fed. Cir. 2009)).

The "court reviews the record as a whole, including any evidence that 'fairly detracts from the

substantiality of the evidence,' in determining whether substantial evidence exists." Gallant, 602

F.3d at 1323 (quoting Micron Tech., Inc. v. United States, 117 F.3d 1386, 1393 (Fed. Cir.

1997)).

To determine whether Commerce's interpretation and application of an antidumping

statute at issue is otherwise "in accordance with law," the court must conduct the two-step

analysis articulated by the Supreme Court in Chevron U.S.A., Inc. v. Natural Res. Def. Council,

Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). See Pesquera Mares

Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[S]tatutory

interpretations articulated by Commerce during its antidumping proceedings are entitled to

judicial deference under Chevron.").

Under the first step of the Chevron analysis, the court must ascertain "whether Congress

has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the

end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." Wheatland Tube Co. v. United States, 495 F.3d 1355, 1359 (Fed.

Cir. 2007) (quoting Chevron, 467 U.S. at 842-43).  Of particular importance to the instant action

is the "strong presumption that 'Congress expresses its intent through the language it chooses'

and that the choice of words in a statute is therefore deliberate and reflective," Shoshone Indian

Tribe of the Wind River Reservation v. United States, 364 F.3d 1339, 1347 (Fed. Cir. 2004)

(quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 433 n.12, 107 S. Ct. 1207, 94 L. Ed. 2d 434

(1987)).  Without more, "[i]t is not for [the court] to try to avoid the conclusion that Congress did

not mean what it said." <u>Miles v. United States</u>, 61 Cust. Ct. 245, 248, 290 F. Supp. 395 (1968)

(quoting <u>Unexcelled Chemical Corp. v. United States</u>, 345 U.S. 59, 64, 73 S. Ct. 580, 97 L. Ed.

821 (1953)); <u>see also</u> <u>Wheatland Tube</u>, 495 F.3d at 1359.

The court reaches the second step of the <u>Chevron</u> analysis only "if the statute is silent or

ambiguous with respect to the specific issue." <u>Wheatland Tube</u>, 495 F.3d at 1359 (quoting

<u>Chevron</u>, 467 U.S. at 843).  Under this step, the court must evaluate whether Commerce's

interpretation "is based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843.

The agency's construction need not be the only reasonable interpretation or even the most

reasonable interpretation. <u>Zenith Radio Corp. v. United States</u>, 437 U.S. 443, 450, 98 S. Ct.

2441, 57 L. Ed. 2d 337 (1978).  The court must defer to Commerce's reasonable interpretation of

a statute even if it might have adopted another interpretation had the question first arisen in a

judicial proceeding. <u>Id.</u>

# IV
# DISCUSSION

This action is properly limited to entries of the subject merchandise that were imported

by KYD from King Pac and Master Packaging and are covered by the third administrative

review. <u>See</u> <u>infra</u> Parts IV.A-B.  Because King Pac and Master Packaging were uncooperative,

Commerce is required to use the facts otherwise available to determine the amount of dumping

for each of these entries. <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at 1326; 19 U.S.C. § 1677e(a).

Furthermore, Commerce may select rather than calculate an antidumping duty rate for these

entries. <u>See</u> <u>infra</u> Part IV.C.  Finally, precedent permits Commerce to use adverse inferences in

selecting that rate. <u>See</u> <u>KYD I</u>, 607 F.3d at 762 (citing 19 U.S.C. § 1677e(b)), 768.  In short,

nothing in the instant decision precludes Commerce from ultimately instructing Customs to liquidate these entries at some TAFA rate.

The remaining question in this case is whether the particular rate that Commerce selected for these entries—122.88 percent—is supported by substantial evidence and otherwise in accordance with law.  It is not.  In particular, Commerce did not sufficiently corroborate this rate with respect to entries imported by KYD from either Master Packaging, see infra Part IV.D.1, or King Pac, see infra Part IV.D.2.  Moreover, substantial evidence on the record—including, inter alia, the information submitted by KYD—does not support application of a 122.88 percent rate to the entries at issue. See infra Part IV.E.

The court's analysis proceeds in five parts.  The statute governing administrative reviews focuses on individual entries, see infra Part IV.A, and Commerce's interpretation of that statute is not well reasoned, see infra Part IV.B.  Although Commerce may base its determinations on an antidumping duty rate that it selects, see infra Part IV.C, the rate actually selected was improperly corroborated, see infra Part IV.D, and is not supported by substantial evidence, see infra Part IV.E.

**A**
**The Statute Governing Administrative Reviews Focuses On Individual Entries**

"Unlike the systems of some other countries, the United States uses a 'retrospective' assessment system under which final liability for antidumping and countervailing duties is determined after merchandise is imported.  Generally, the amount of duties to be assessed is determined in a review of the order covering a discrete period of time." 19 C.F.R. § 351.212(a); see also SKF USA, Inc. v. United States, 537 F.3d 1373, 1381 (Fed. Cir. 2008); Statement of

Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) ("SAA") at 815, reprinted in 1994 U.S.C.C.A.N. 4040, 4157.[2]

The statute governing an administrative review of an antidumping duty order requires Commerce to "determine—(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry." 19 U.S.C. § 1675(a)(2)(A) (emphasis added); see also Consol. Bearings Co. v. United States, 348 F.3d 997, 1005 (Fed. Cir. 2003); KYD II, 704 F. Supp. 2d at 1329.[3]  "The term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) (emphasis added); see KYD II, 704 F. Supp. 2d at 1326 n.5; infra note 8.[4]  To calculate these dumping margins, Commerce uses sales as a proxy for entries. See Koyo Seiko Co. v. United States, 258 F.3d 1340, 1342-43 (Fed. Cir. 2001).[5]

The resulting determination "shall be the basis for the assessment of . . . antidumping duties on entries of merchandise covered by the determination and for deposits of estimated

---

[2] The Uruguay Round Agreements Act ("URAA") approved the new World Trade Organization Agreement, and the agreements annexed thereto, "resulting from the Uruguay Round of multilateral trade negotiations [conducted] under the auspices of the General Agreement on Tariffs and Trade." 19 U.S.C. § 3511(a)(1).  The SAA, which was submitted to and approved by Congress, see 19 U.S.C. § 3511(a)(2), is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

[3] Commerce "may . . . use averaging and statistically valid samples, if there is a significant volume of sales of the subject merchandise or a significant number or types of products." 19 U.S.C. § 1677f-1; see KYD II, 704 F. Supp. 2d. at 1329, 1333-34.  In addition, "the preferred methodology in reviews [is] to compare average [normal values] to individual export prices." SAA at 843, 1994 U.S.C.C.A.N. at 4178.

[4] The corresponding pre-URAA provision likewise directed Commerce to "determine—(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and (B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry." 19 U.S.C. § 1675(a)(2) (1990).

[5] Although the correspondence between sales and entries during a period of review may be imperfect, particularly in the case of constructed export price sales between an exporter and its affiliated importer, the Federal Circuit has upheld this practice as a reasonable interpretation of 19 U.S.C. § 1675. See Koyo, 258 F.3d at 1342-43.

duties." 19 U.S.C. § 1675(a)(2)(C).  In this sense, an administrative review serves two distinct

functions, one retrospective and the other prospective.[6]

The retrospective function of such a review is to determine the actual antidumping duty

to be assessed on each entry of subject merchandise imported during the period of review from

each exporter or producer (collectively "exporter") examined in the review.  Although

Commerce historically prepared a "master list" that specified this duty for each individual entry,

it now calculates a single assessment rate for each unaffiliated importer of entries covered by the

review. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,314-15 (May

19, 1997); Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,316-17 (February

27, 1996).[7]  The rate may be either a percentage or a per-unit amount. E.g., Ball Bearings and

Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of

Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review,

and Revocation of an Order in Part, 75 Fed. Reg. 53,661, 53,663 (September 1, 2010).

Commerce calculates a percentage by "divid[ing] the total dumping margins for the reviewed

sales by the total entered value of those reviewed sales for each importer" and calculates a per-

---

[6] 19 U.S.C. § 1675(a) also provides for reviews for exporters and producers that did not export subject merchandise during the period of investigation. See 19 U.S.C. § 1675(a)(2)(B).  Although this provision governing these new shipper reviews only directs Commerce to determine a "weighted average dumping margin," id., Congress intended these reviews to be retrospective as well as prospective, see SAA at 875, 1994 U.S.C.C.A.N. at 4203.  Consistent with this intent, Commerce generally conducts these reviews like it conducts annual reviews. See 19 C.F.R. §§ 351.212(b)(1) (referencing 19 C.F.R. § 351.214); 19 C.F.R. § 351.214(h) (referencing 19 C.F.R. § 351.221).  Regardless, the administrative review at issue in this matter is an annual review rather than a new shipper review. See supra Part II; KYD II, 704 F. Supp. 2d at 1334.

[7] Commerce alternates between characterizing these rates as specific to each importer and specific to each importer/exporter pair. See, e.g., 75 Fed. Reg. at 53,663; Final Results, 74 Fed. Reg. at 2,512; 19 C.F.R. § 351.212(b)(1).  This raises the question of whether Commerce calculates more than one rate for an importer that purchases subject merchandise from more than one examined exporter.  Regardless, the duties assessed to such an importer would appear to be the same under both approaches, and this opinion therefore uses the term "importer-specific" to refer to either approach.  When calculating such rates, Commerce aggregates importers that are affiliated both with each other and with a single exporter "to prevent [these] affiliates from manipulating individual assessment rates to their advantage." Issues and Decision Memorandum appended to Ball Bearings and Parts Thereof From France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part, 75 Fed. Reg. 53,661 (September 1, 2010), cmt. 7.

unit amount by "divid[ing] the total dumping margins . . . for each exporter's importer or customer by the total number of units the exporter sold to that importer or customer." E.g., id.; see also Final Results, 74 Fed. Reg. at 2,512; 19 C.F.R. § 351.212(b)(1); Koyo, 258 F.3d at 1342-43.  Because importers are responsible for the antidumping duties imposed on their entries, see 19 U.S.C. § 1673g(b)(4), the entry-specific and importer-specific methods result in equivalent liabilities for each importer to the extent that reviewed entries correspond to reviewed sales. Commerce includes these assessment rates in its liquidation instructions to Customs but not in its published results. E.g., 75 Fed. Reg. at 53,663; Final Results, 74 Fed. Reg. at 2,512.

In contrast, the prospective function of a review is to determine the cash deposit to be collected on each future entry of subject merchandise imported from each exporter examined in that review.  This estimated duty is equal to the "weighted average dumping margin," e.g., 75 Fed. Reg. at 53,663; Final Results, 74 Fed. Reg. at 2,512, which is calculated "by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer," 19 U.S.C. § 1677(35)(B). See Koyo, 258 F.3d at 1342-43.[8]  Commerce includes these weighted average dumping margins in its instructions to Customs as well as in its published results. E.g., 75 Fed. Reg. at 53,663; Final Results, 74 Fed. Reg. at 2,512.

The table below summarizes the key differences between these two functions of an administrative review of an antidumping duty order.

---

[8] Critically, the term "dumping margin" is statutorily distinct from the term "weighted average dumping margin." Compare 19 U.S.C. § 1677(35)(A) with 19 U.S.C. § 1677(35)(B); see also KYD II, 704 F. Supp. 2d at 1332.  At oral argument, the court asked each of the parties to define "dumping rate," "dumping margin," "weighted average dumping margin," "estimated weighted average dumping margin," "assessment rate," and "cash deposit rate." February 9, 2011 Oral Argument at 10:55:05-11:04:50.  Each party distinguished between "dumping margin" and "weighted average dumping margin." Id.  The parties also agreed that there is "a difference between an amount and a percentage." Id. at 11:05:04-11:08:41 (discussing KYD II, 704 F. Supp. 2d at 1326 n.5).

|  | **Actual Antidumping Duty** | **Estimated Antidumping Duty** |
|---|---|---|
| **Application** | Assessment of Duties | Collection of Cash Deposits |
| **Orientation** | Retrospective (Past Entries) | Prospective (Future Entries) |
| **Specificity** | Importer (or Importer/Exporter) | Exporter |
| **Formula** | $$\frac{\textit{Dumping Margin for Each Importer}}{\textit{Entered Value for Each Importer}}$$ or $$\frac{\textit{Dumping Margin for Each Importer}}{\textit{Number of Units for Each Importer}}$$ | $$\frac{\textit{Dumping Margin for Each Exporter}}{\textit{Export Price and Constructed Export Price for Each Exporter}}$$ |
| **Published in Final Results** | No | Yes |
| **Included in Instructions to Customs** | Yes | Yes |

In short, Commerce determines estimated duties based on dumping margins calculated for exporters and determines actual duties based on dumping margins calculated for importers. See, e.g., Koyo, 258 F.3d at 1342-43. This is because "an exporter/producer may have dumped at different rates to different unaffiliated importers." Department of Commerce, Antidumping Manual (October 13, 2009), Chap. 6.

In making these determinations, Commerce sometimes faces information that is incomplete or unreliable. "[I]f an interested party withholds or fails to provide requested information, Commerce shall 'use the facts otherwise available in reaching the applicable determination.'" KYD I, 607 F.3d at 762 (quoting 19 U.S.C. § 1677e(a)(2)). "In the case of an uncooperative respondent, Commerce 'may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available.'" Id. (quoting 19 U.S.C.

§ 1677e(b)).  However, "when Commerce 'relies on secondary information rather than on information obtained in the course of' the administrative review, it 'shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal.'" KYD II, 704 F. Supp. 2d at 1330 (quoting 19 U.S.C. § 1677e(c)).

It is significant that these three provisions of 19 U.S.C. § 1677e facilitate rather than supersede the actual and estimated antidumping duty determinations required under 19 U.S.C. § 1675(a). See 19 U.S.C. § 1677e(a)(2) (". . . in reaching the applicable determination . . ."); KYD II, 704 F. Supp. 2d at 1333 (discussing Valley Fresh Seafood, Inc. v. United States, 31 CIT 1989, 1997-98 (2007)); cf. F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("[T]he purpose of [19 U.S.C. § 1677e(b)] is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."); Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) ("[T]he basic purpose of the [antidumping] statute [is] determining current margins as accurately as possible.").[9]  Even if a party is uncooperative, Commerce is still constrained by "commercial reality." Gallant, 602 F.3d at 1323.

The instant action challenges only Commerce's selection and corroboration of the 122.88 percent actual antidumping duty rate for the entries at issue. See KYD II, 704 F. Supp. 2d at 1334 n.17; KYD's Memorandum in Support of Motion for Judgment on the Agency Record (Doc. No. 42) ("KYD's Memo") at 12; Plaintiff's Reply [in support of its motion for summary judgment] (Doc. No. 50) at 7; February 9, 2011 Oral Argument at 11:54:57-11:55:16 ("We're not challenging the prospective rate.  That's really not an issue here.  We're looking solely on the retrospective. . . .  We don't care about the cash deposit rate. . . .  We're only challenging the duty

---

[9] Rhone's reasoning has outlasted the statute that it addressed. See KYD II, 704 F. Supp. 2d at 1330 n.8; infra Part IV.D.

assessment rate. . . .").  Accordingly, the court need not review Commerce's selection and corroboration of the 122.88 percent rate for any entries not imported by KYD or for any future entries whatsoever.

The entries actually at issue comprise all of KYD's imports of the subject merchandise from King Pac and Master Packaging during the period of review.  See Summons (Doc. No. 1); February 18, 2009 Order (Doc. No. 26).  Unlike in the previous administrative review, KYD provided information about these entries.  See KYD II, 704 F. Supp. 2d at 1331 n.10.  This information, while incomplete, nonetheless facilitates the determinations required under 19 U.S.C. § 1675(a).  In combination with other record evidence, it permits Commerce to more closely assess whether a rate of 122.88 percent describes with reasonable accuracy the dumping behavior of each of King Pac and Master Packaging toward KYD, "albeit with some built-in increase intended as a deterrent to non-compliance." Gallant, 602 F.3d at 1323 (quoting and emphasizing De Cecco, 216 F.3d at 1032); see infra Parts IV.D-E.

This conclusion is narrow.  It does not apply if an importer provides no information. See KYD I, 607 F.3d at 767.  Nor does it apply if an interested party supplies only some of its data in a potentially selective manner. See Steel Auth. of India, Ltd. v. United States, 25 CIT 482, 487, 149 F. Supp. 2d 921 (2001) ("SAIL").  KYD, however, stated that it submitted all relevant information in its possession regarding the universe of pertinent transactions, see Redetermination at 19, and the record shows that Commerce has not asked for more, see, e.g., id. at 1-10, 19-21.  Accordingly, an examination of the record with respect to the entries at issue gives effect to the Federal Circuit's invitation to importers to "produce[] current information showing the margin to be less," KYD I, 607 F.3d at 766-67 (quoting Rhone, 899 F.2d at 1190);

see infra Part IV.D.2, and, ultimately, to the statutory structure for an administrative review, see

19 U.S.C. § 1675(a).

**B**

**Commerce's Interpretation Of 19 U.S.C. § 1675(a) Is Not Well Reasoned**

In its Redetermination, Commerce "find[s] that the statute does not require us to calculate

an importer-specific dumping margin because the statute states explicitly that dumping margins

are calculated for producers and exporters." Redetermination at 15.  Commerce is correct that 19

U.S.C. § 1675(a) does not require the calculation of importer-specific dumping margins.  Instead,

this provision requires the determination of entry-specific dumping margins. See 19 U.S.C.

§ 1675(a); see generally supra Part IV.A.  As the Federal Circuit explained:

> Section 1675 sets forth the framework for an administrative review of
> antidumping duties.  This section clearly places the focus of the administrative
> review on the entry of merchandise.  For example, section 1675(a)(2)(A) requires
> Commerce to "determine . . . the normal value and export price (or constructed
> export price) of each entry of subject merchandise, and . . . the dumping margin
> for each such entry." 19 U.S.C. § 1675(a)(2)(A) (emphases added).

Consol. Bearings Co. v. United States, 348 F.3d 997, 1004-05 (Fed. Cir. 2003).  Commerce, not

Congress or this court, decided to determine importer-specific dumping margins as an alternate

method for correctly attributing the antidumping duties that would result from determining entry-

specific dumping margins. See 19 C.F.R. § 351.212(b)(1); 62 Fed. Reg. at 27,314-15 (justifying

Commerce's prior shift from an entry-specific assessment method to an importer-specific

assessment method); 61 Fed. Reg. at 7,316-17 ("To the extent possible, these assessment rates

will be specific to each importer, because the amount of duties assessed should correspond to the

degree of dumping reflected in the price paid by each importer.").

Accordingly, where Commerce has the necessary information to distinguish among unaffiliated importers, it is required by 19 U.S.C. § 1675(a) to do so. As the Federal Circuit observed:

> [A]ntidumping duties ensure that each import reflects correct market values. Once the review sets the market value of the merchandise, the focus shifts to importation of the merchandise, not the character of the merchandise itself. Accordingly, importers of the same merchandise can have different antidumping duties, just as the final results in this case established various importer-specific rates for those who participated in the review. The character of the merchandise does not control the assessment of duties, but the market forces in play at the time of each separate import transaction. The simple fact that one importer imports the same merchandise as another importer does not necessarily lead to the conclusion that they are subject to the same antidumping duties. Because sales prices vary from exporter to exporter and from time to time, separate entries of the same good may have different duties.

Consol. Bearings, 348 F.3d at 1005.

Moreover, in originally remanding the instant matter, this court already considered and rejected Commerce's position as "at odds with the plain meaning of 19 U.S.C. § 1675(a)(2)(A)." KYD II, 704 F. Supp. 2d at 1332. As the court stated, Commerce "is directed by Congress to determine the normal value and export price of—and the dumping margin for—'each entry of the subject merchandise.'" Id. (quoting and emphasizing 19 U.S.C. § 1675(a)(2)(A)).

Because "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Wheatland Tube, 495 F.3d at 1359 (quoting Chevron, 467 U.S. at 842-43); see supra Part III. Although Commerce's interpretation of antidumping duty law is entitled to great respect, see De Cecco, 216 F.3d at 1032, Congress's unambiguous statement of that law is entitled to even more deference, see Wheatland Tube, 495 F.3d at 1359.

Nonetheless, because of Commerce's special role in administering antidumping duty law, see De Cecco, 216 F.3d at 1032, further discussion of its arguments is appropriate. Commerce

relies primarily on two statutory provisions (19 U.S.C. § 1673d(c)(1) and 19 U.S.C.

§ 1673g(b)(4)), see infra Parts IV.B.1-2, and on its reading of the Federal Circuit's decision in

KYD I, 607 F.3d at 768, see infra Part IV.B.3.  As discussed below, the court finds these

arguments unpersuasive.


**1**
**19 U.S.C. § 1673d Does Not Govern The Calculation Of Actual Antidumping Duties**
**In An Administrative Review**

Commerce argues that "the statute" compels a conclusion contrary to that reached by this

court in KYD II, 704 F. Supp. 2d at 1329:

> As the Department explained in the Final Results and as the Department argued in
> its brief to the Court, the antidumping duty statute does not require, or even
> contemplate, the Department calculating separate dumping margins for individual
> importers.  [19 U.S.C. § 1673d(c)(1)(B)(i)(I) and (III)] specifically direct that the
> Department shall "determine the estimated weighted average dumping margin for
> each exporter and producer individually investigated" and "order the posting of a
> cash deposit, bond or other security" "based on the estimated weighted average
> dumping margin . . ." (emphasis added).

Redetermination at 3-4, 15.

Commerce's citation of 19 U.S.C. § 1673d is unpersuasive for three reasons.  First,

Commerce erroneously conflates antidumping duty investigations and administrative reviews.

19 U.S.C. § 1673d governs investigations rather than reviews. See 19 U.S.C. § 1673d.  Whereas

investigations determine only estimated duties, reviews determine both estimated duties and

actual duties. <u>Compare</u> 19 U.S.C. §§ 1673b, 1673d <u>with</u> 19 U.S.C. § 1675(a).[10]  As Commerce's own Antidumping Manual states:

> In an investigation, we calculate a single weighted-average dumping margin for an exporter/producer which will be used for bonding or cash deposit purposes until there is an administrative review.  For an administrative review, a weighted-average margin is also established for each producer/exporter, and an assessment rate is established for each U.S. importer because an exporter/producer may have dumped at different rates to different unaffiliated importers.

Department of Commerce, Antidumping Manual (October 13, 2009), Chap. 6.

Second, Commerce erroneously conflates estimated duties and actual duties.  Although estimated duties are based on dumping margins calculated for exporters, actual duties are based on dumping margins calculated for importers. <u>See, e.g.</u>, <u>Koyo</u>, 258 F.3d at 1342-43.  As the Federal Circuit explained:

> Commerce has adopted two different calculational approaches—one for cash deposits and one for final duties.  Commerce requires importers to make cash deposits in an amount based, in pertinent part, on the "estimated weighted average dumping margin" for the merchandise. 19 U.S.C. § 1673b(d)(1)(B).  Commerce calculates this "estimated weighted average dumping margin," <u>i.e.</u>, estimated duty, by "dividing the aggregate dumping margins determined <u>for a specific exporter or producer</u> . . . by the aggregate export prices or constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B). . . .  This rate is then applied to estimated imports. . . .
>
> Commerce has devised a different methodology for use in calculating the final amount of the duties to be imposed on merchandise already imported into the United States.  When an antidumping duty is imposed upon imported merchandise, Commerce calculates an assessment rate <u>for each importer</u> by

---

[10] In an investigation that produces an affirmative determination of dumping, Commerce "shall—(i) determine an estimated weighted average dumping margin for each exporter and producer individually investigated, and (ii) determine, in accordance with [19 USC § 1673d(c)(5)], an estimated all-others rate for all exporters and producers not individually investigated" and "shall order the posting of a cash deposit, bond, or other security, as [Commerce] deems appropriate, for each entry of the subject merchandise in an amount based on the estimated weighted average dumping margin or the estimated all-others rate, whichever is applicable." 19 U.S.C. § 1673b(d)(1); <u>see also</u> 19 U.S.C. § 1673d(c)(1)(B).  In an administrative review, however, Commerce shall "review, and determine . . . , the amount of any antidumping duty" by "determin[ing]—(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry" and "shall publish in the Federal Register the results of such review, together with notice of any duty to be assessed [or] estimated duty to be deposited." 19 U.S.C. § 1675(a)(1)-(2).  The existing cash deposit rate becomes the assessment rate only if no party requests an administrative review. 19 C.F.R. § 351.212(c).

dividing the dumping margin for the subject merchandise . . . by the entered value
of such merchandise for normal Customs purposes.  This methodology has been
codified in [19 C.F.R. § 351.212(b)(1)]. . . .  That rate is then applied to the
merchandise imported . . . during [the] review period.

Koyo, 258 F.3d at 1342-43 (internal citations omitted) (emphasis added); see also id. at 1343 n.4

(defining "the importer-specific assessment rate" as a function of normal value, U.S. price, and

entered value).

Third, Commerce erroneously conflates dumping margins and weighted average dumping

margins.  A dumping margin is "the amount by which the normal value exceeds the export price

or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A) (emphasis

added).  In contrast, a "weighted average dumping margin" is a percentage based in part on the

dumping margin calculated for an exporter. 19 U.S.C. § 1677(35)(B).  That weighted average

dumping margin becomes the cash deposit rate used to collect estimated duties on future entries.

See, e.g., 75 Fed. Reg. at 53,663.  It does not necessarily become the assessment rate used to

collect actual duties on reviewed entries.  See 19 U.S.C. § 1675(a).

In short, Commerce's argument relies solely on a statutory provision that implicates

investigations rather than reviews, estimated duties rather than actual duties, and weighted

average dumping margins rather than dumping margins alone.  See 19 U.S.C. § 1673d.  That

argument is not persuasive.


**2**
**19 U.S.C. § 1673g(b)(4) Governs Payment, Not Determination, Of Duties**

Commerce repeatedly notes that 19 U.S.C. § 1673g(b)(4) obligates the importer of entries

that are subject to an antidumping duty order to pay the antidumping duties assessed on those

entries. See Redetermination at 9 ("The CAFC . . . affirm[ed] the ruling of the lower court that

. . . under [19 U.S.C. § 1673g(b)(4)] importers have the legal responsibility to pay assessed

duties associated with the goods they import."), 15 ("Also, the liability for the resultant antidumping duties rests solely with the importer. <u>See</u> [19 U.S.C. § 1673g(b)(4)]."), 28 ("When unaffiliated importers enter into a commercial agreement with an exporter/producer to import merchandise subject to an antidumping or countervailing duty order, they do so with an understanding that they must pay all duties assessed against that exporter/producer for the subject merchandise pursuant to [19 U.S.C. § 1673g(b)(4)]."), 30 ("Indeed, the CAFC upheld the lawfulness of the 122.88 percent rate in [<u>KYD I</u>] as well as KYD's obligation to pay its allocation of the dumping duties applied to merchandise that KYD purchased from King Pac."), 32 ("During the [period of review], KYD had legal responsibilities to pay dumping liabilities assigned to King Pac and Master Packaging and we do not have the statutory authority to absolve it of those responsibilities through a remand redetermination.").

19 U.S.C. § 1673g(b)(4) does refute the argument that "a cooperative, independent importer should not be required to pay an assessment based on" a lawfully determined rate. <u>KYD I</u>, 607 F.3d at 768; <u>see also</u> <u>KYD I</u>, 613 F. Supp. 2d at 1382 ("[I]mporters are responsible to pay the antidumping duties to which they are subject, including any increases over the deposit made upon entry for estimated antidumping duties."); <u>KYD II</u>, 704 F. Supp. 2d at 1334 n.17 ("Remand in this action is limited to KYD's entries of the subject merchandise during the [period of review]—entries which have already occurred and for which KYD alone is required to pay duties pursuant to 19 U.S.C. § 1673g(b)(4).").

However, Commerce's obligation to correctly determine antidumping duties under 19 U.S.C. § 1675(a) is not diminished by an importer's obligation to pay those duties under 19 U.S.C. § 1673g(b)(4).  KYD seeks a reasonably accurate assessment rate for its entries. <u>See</u> KYD's Memo at 3 ("If a rate is to be calculated for KYD based on adverse inferences, the

selected rate cannot be used as it was not properly corroborated and not supported by substantial evidence and does not reflect the actual experience of KYD plus a reasonable amount for deterrence."), 19-35.  Commerce is statutorily required to oblige.  <u>See</u> 19 U.S.C. § 1675(a); <u>supra</u> Part IV.A; <u>infra</u> Part IV.D.

**3**
**The Federal Circuit's Holding In <u>KYD I</u> Does Not Preclude Remand**

According to Defendant, KYD's "fundamental argument" is that "Commerce must calculate a separate antidumping duty rate for importers who participate in an administrative proceeding, even if the unrelated exporters of the examined merchandise receive adverse facts available, pursuant to [19 U.S.C. § 1677e(b)]." Defendant's Response to Plaintiff's Comments on the Department of Commerce's Redetermination on Remand (Doc. No. 80) at 2.  Commerce believes that the Federal Circuit's decision in <u>KYD I</u>, 607 F.3d 760, undermines such an argument:

> The Court's remand order in this case is based on the premise that KYD could receive the remedy in this case that it requested in [<u>KYD I</u>].  The CAFC has indicated clearly that this remedy is unavailable to KYD.  Accordingly, even if we could use KYD's data in our calculations (and we cannot as described above), we do not believe the results of such an analysis would be applicable in light of the CAFC's ruling in [<u>KYD I</u>].

Redetermination at 10.

The court is aware of the arguments in <u>KYD I</u>, <u>see</u> <u>KYD I</u>, 613 F. Supp. 2d 1371 (Wallach, J.), <u>aff'd</u>, <u>KYD I</u>, 607 F.3d 760, as well as the basis for the remand order in <u>KYD II</u>, <u>see</u> <u>KYD II</u>, 704 F. Supp. 2d 1323 (Wallach, J.).  Commerce is correct that KYD is not exempt from the results of the administrative review. <u>See</u> <u>supra</u> Part IV.B.2.  However, to the court, KYD's fundamental argument appears to be that record evidence demonstrates that the assessment rate applied to KYD's entries is unlawfully high. <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at

1324.  The remedy sought by KYD is remand for the purpose of determining a more accurate

assessment rate.  <u>See</u> KYD's Comments on the Department's Remand Determination ("KYD's

Comments") at 30.  Commerce points to nothing in the Federal Circuit's decision that forecloses

this remedy.  <u>See generally</u> Redetermination at 9-10, 27-32.[11]

**C**

**Commerce May Base Each Dumping Margin Determination On A Rate That It Selects**

Having held that the statute governing administrative reviews focuses on individual

entries, the court now turns to Commerce's determinations in the instant matter.  This matter was

originally remanded so that Commerce could apply 19 U.S.C. § 1677m(e) to the price

information submitted by KYD. <u>KYD II</u>, 704 F. Supp. 2d at 1331-32.  KYD had argued that

Commerce could use that information in combination with additional facts available to calculate

dumping margins for the entries at issue.  <u>See</u> <u>id.</u> at 1328, 1332.  Commerce rejected that

argument without evaluating the statutory criteria that govern the use of imperfect information

submitted by an interested party.  <u>See</u> <u>id.</u> at 1328, 1332 (discussing 19 U.S.C. § 1677m(e)).

KYD and Commerce now advance competing constructions of 19 U.S.C. § 1677m(e) as

it relates to 19 U.S.C. §§ 1675(a) and 1677e.  <u>Compare</u> KYD's Comments at 4-9 <u>with</u>

Redetermination at 4-9.  KYD appears to view export price and normal value as relevant

"determinations" under 19 U.S.C. § 1675(a).  <u>See</u> KYD's Comments at 4-9.  On this view, for

each relevant entry, Commerce must use KYD's information pursuant to 19 U.S.C. § 1677m(e)

to determine export price and use facts available pursuant to 19 U.S.C. § 1677e to determine

---

[11] In holding that Commerce may use adverse inferences to determine assessment rates for unaffiliated importers, the Federal Circuit did state that "KYD does not point to any statute or regulation that would entitle independent importers to a different assessment rate from the rate for importers that are affiliated with the foreign producer/exporters of the good they import." <u>KYD I</u>, 607 F.3d at 768.  This statement is best understood in that context as a rejection of KYD's request for a special non-adverse assessment rate. <u>See</u> <u>id.</u>; <u>KYD I</u>, 613 F. Supp. 2d at 1381-82; <u>see also</u> <u>supra</u> Part IV.A.

normal value.  From these values, Commerce could then calculate a dumping margin for each entry.[12]

In contrast, Commerce appears to view dumping margin as the only relevant "determination" under 19 U.S.C. § 1675(a). <u>See</u> Redetermination at 4-6.  On this view, KYD's information, standing alone, is "so incomplete that it cannot serve as a reliable basis for the applicable determination." 19 U.S.C. § 1677m(e)(3).  Pursuant to 19 U.S.C. § 1677e, Commerce could therefore base its dumping margin determination on an antidumping duty rate that it selects rather than on individual calculations of normal value and export price.[13]

The meaning of "determination" is not clear from the relevant statutes.  This term could plausibly refer to the antidumping duty determination that Commerce is required to make or to any of the other determinations that such a duty determination normally requires.  Because 19 U.S.C. § 1677m(e) is ambiguous on this point and Commerce has now proffered a reasonable interpretation as part of its administrative proceeding, the court must defer to that reasonable interpretation. <u>See</u> <u>supra</u> Part III; <u>see also</u> <u>SAIL</u>, 25 CIT 482, <u>cited in</u> Redetermination at 5-6.[14]

Substantial evidence supports Commerce's application of this interpretation to KYD's price information.  That information, on its own, permits at most a determination of the export price of KYD's imports from King Pac and Master Packaging. <u>See</u> Redetermination at 7-9; KYD's Comments at 3.  Under Commerce's reasonable interpretation of 19 U.S.C. § 1677m(e),

---

[12] On this view, Commerce would also be required to use facts available to fill certain gaps in KYD's price information.  For example, Commerce might use data submitted by other respondents to make commercially reasonable assumptions about resin content, whether or not those assumptions are based on adverse inferences pursuant to 19 U.S.C. § 1677e(b). <u>See</u> Redetermination at 25-27.

[13] Commerce also argues that it cannot use KYD's price information "without undue difficulties" and that even if the applicable determination were export price, KYD's information remains "so incomplete that it cannot serve as a reliable basis for [that] determination." Redetermination at 7-9.  The court need not consider these arguments.

[14] In <u>SAIL</u>, which involved the treatment of incomplete responses by an uncooperative exporter, this court deferred to Commerce's interpretation of the term "information" in 19 U.S.C. § 1677m(e). <u>See</u> <u>SAIL</u>, 25 CIT at 482, 485-86.

this information is "so incomplete that it cannot serve as a reliable basis for reaching the applicable determination"—that is, the calculation of a dumping margin for each of the entries at issue. 19 U.S.C. § 1677m(e)(3).

Accordingly, Commerce is entitled to select an antidumping duty rate from the facts available in order to determine these dumping margins. The question then becomes whether the particular rate selected by Commerce—122.88 percent—is properly corroborated and supported by substantial evidence with respect to these entries. See infra Parts IV.D-E.

**D**

**Commerce Improperly Relied On The Rhone Presumption To Support The Selected Rate**

"[W]hen Commerce 'relies on secondary information rather than on information obtained in the course of' the administrative review, it 'shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal.'" KYD II, 704 F. Supp. 2d at 1330 (quoting 19 U.S.C. § 1677e(c)). "Congress intended for this requirement to 'prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence.'" Id. (quoting PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed. Cir. 2009)).

"In order to corroborate secondary information, Commerce must find that 'the secondary information to be used has probative value.'" KYD I, 613 F. Supp. 2d at 1378 (quoting SAA at 870, 1994 U.S.C.C.A.N. at 4199). "Commerce evaluates whether secondary information has probative value by assessing its reliability and relevance." Id. (citing Mittal Steel Galati S.A. v. United States, 491 F. Supp. 2d 1273, 1278 (CIT 2007)); see also KYD I, 607 F.3d at 764.[15]

---

[15] The reliability and relevance analyses appear to overlap somewhat. Compare Gallant, 602 F.3d at 1323-24 with KYD I, 607 F.3d at 766-67.

In some circumstances, "Commerce is permitted to use a 'common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced <u>current</u> information showing the margin to be less.'" <u>KYD I</u>, 607 F.3d at 766-67 (quoting <u>Rhone</u>, 899 F.2d at 1190 and citing <u>Ta Chen Stainless Steel Pipe, Inc. v. United States</u>, 298 F.3d 1330, 1339 (Fed. Cir. 2002)).[16]

The relationship between this "presumption," <u>id.</u> at 767, and 19 U.S.C. § 1677e(c) is not entirely clear.  <u>Rhone</u> actually predates the enactment of 19 U.S.C. § 1677e(c).  <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at 1329-30 (discussing the "best information available" standard); <u>see also</u> <u>Tianjin Mach. Import & Export Corp. v. United States</u>, Slip Op. 11-1 at 24-26 (CIT January 4, 2011); <u>Fujian Lianfu Forestry Co. v. United States</u>, 638 F. Supp. 2d 1325, 1336-37 (CIT 2009); <u>Gerber Food (Yunnan) Co. v. United States</u>, 31 CIT 921, 947-48, 491 F. Supp. 2d 1326 (2007).  Its presumption "does not appear in the statute or regulations, but is a product of agency decision making." <u>KYD I</u>, 607 F.3d at 769 (Dyk, J., concurring in part and dissenting in part) (citing <u>Ta Chen</u>, 298 F.3d at 1339).  The Federal Circuit appears to have held that Commerce can use this presumption to establish the <u>relevance</u> of a rate for the purpose of corroboration. <u>See</u> <u>KYD I</u>, 607 F.3d at 764, 766.

This <u>Rhone</u> presumption of relevance is nonetheless subject to at least two significant conditions.  First, it is limited to previously examined exporters. <u>See</u> <u>infra</u> Part IV.D.1.  Second, it is rebuttable. <u>See</u> <u>infra</u> Part IV.D.2.  Because of these conditions, the <u>Rhone</u> presumption does not fully apply to KYD's imports from King Pac and Master Packaging. <u>See</u> <u>infra</u> Parts IV.D.1-2.

---

[16] Commerce states that <u>Rhone</u> "does not apply" because the importer in that case was affiliated with the exporter. Redetermination at 16.  The Federal Circuit believes that <u>Rhone</u> applies. <u>See</u> <u>KYD I</u>, 607 F.3d at 766 (quoting <u>Rhone</u>, 899 F.2d at 1190).  So does this court. <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at 1329-30 (quoting <u>Rhone</u>, 899 F.2d at 1190, 1191).  So too does Commerce. <u>See</u> Preliminary Results, 73 Fed. Reg. at 52,290 (citing <u>Rhone</u>, 899 F.2d at 1190).  <u>Ta Chen</u> endorses but does not actually apply the <u>Rhone</u> presumption. <u>See</u> <u>Ta Chen</u>, 298 F.3d at 1339 (citing <u>Rhone</u>, 899 F.2d at 1190); <u>Ta Chen Stainless Steel Pipe, Inc. v. United States</u>, 24 CIT 841, 846 (2000) (explaining that the selected rate was calculated from certain sales made by the exporter during the pertinent period of review).

Absent this presumption, substantial evidence does not support Commerce's determination that the 122.88 percent rate is relevant to these imports. See infra Part IV.E.[17]

**1**
**Commerce Improperly Applied The Rhone Presumption To**
**KYD's Imports From Master Packaging**

The Rhone presumption is limited to exporters that were examined by Commerce in a previous investigation or administrative review. As the Federal Circuit explained, this limitation distinguishes KYD I from Gallant, 602 F.3d 1319. In Gallant, "Commerce had not previously determined an antidumping duty against the exporter in question, and thus there was no occasion for the court to consider the presumption that an exporter's prior margin continues to be valid if the exporter fails to cooperate in a subsequent proceeding." KYD I, 607 F.3d at 767; see also Gallant, 602 F.3d at 1324.

This "presumption applie[d] in [KYD I]." KYD I, 607 F.3d at 767. In the original antidumping duty investigation, Commerce applied a TAFA rate of 122.88 percent to an exporter called Zippac. See Universal Polybag Co. v. United States, 577 F. Supp. 2d 1284, 1300 n.14 (CIT 2008) (Wallach, J.). In the first administrative review, Commerce formally collapsed Zippac and King Pac pursuant to 19 C.F.R. § 351.401(f) and applied that same rate to the collapsed entity. See id. at 1288, 1300 n.4. In the second administrative review, Commerce continued to apply that rate to King Pac. See KYD I, 613 F. Supp. 2d at 1375. The Federal Circuit agreed that these determinations were within Commerce's discretion. See KYD I, 607 F.3d at 766-67.

In the third administrative review, however, Commerce applied the TAFA rate of 122.88 percent to Master Packaging as well as to King Pac. See KYD II, 704 F. Supp. 2d at 1327;

---

[17] This conclusion is not a reflection on Commerce, as the courts have also struggled with the corroboration requirement. See infra Part IV.E.

Redetermination at 32.  Although KYD "provided evidence that King Pac 'has apparently arranged for all of its U.S. export business to be supplied by' . . . Master Packaging," Redetermination at 1, the record contains no evidence that Commerce collapsed these two exporters pursuant to 19 C.F.R. § 351.401(f).  Rather, Commerce continued to treat them as separate entities. <u>See</u> Polyethylene Retail Carrier Bags from Thailand: Preliminary Results of Antidumping Duty Administrative Review and Intent to Rescind in Part, 73 Fed. Reg. 52,288, 52,289-90 (September 9, 2008) ("Preliminary Results"); Final Results, 74 Fed. Reg. at 2,512; Redetermination at 1-32.  Indeed, Commerce explained that it selected Master Packaging as an additional mandatory respondent because "Master Packaging is the only respondent not selected for individual examination originally and unforeseen developments in other proceedings have freed up additional resources within AD/CVD Enforcement Office 5." Polyethylene Retail Carrier Bags from Thailand: Selection of Master Packaging as a Mandatory Respondent, U.S. Department of Commerce (March 27, 2008), Public Record ("P.R.") 79 ("Master Packaging Selection Memo") at 3; <u>see also</u> Preliminary Results, 73 Fed. Reg. at 52,289; <u>KYD II</u>, 704 F. Supp. 2d at 1325-26; <u>supra</u> note 1.

Because Commerce did not previously examine Master Packaging, it cannot simply apply the <u>Rhone</u> presumption to KYD's entries from this exporter.  Instead, Commerce must establish the relevance of any secondary information on which it relies through "'independent sources that are reasonably at [its] disposal'" and otherwise ensure that such information "has some grounding in commercial reality." <u>Gallant</u>, 602 F.3d at 1324 (quoting 19 U.S.C. § 1677e(c)); <u>see also</u> <u>Qingdao Taifa Group Co. v. United States</u>, Slip Op. 10-126, 2010 Ct. Intl. Trade LEXIS 131 at *5 n.1 (CIT November 12, 2010); <u>Tianjin Mach.</u>, Slip Op. 11-1 at 27-28, 36-37.

**2**
**Commerce Improperly Applied The <u>Rhone</u> Presumption To**
**KYD's Imports From King Pac**

An importer can rebut the <u>Rhone</u> presumption by "produc[ing] <u>current</u> information showing the margin to be less." <u>KYD I</u>, 607 F.3d at 766 (quoting <u>Rhone</u>, 899 F.2d at 1190). "'[S]ince the presumption is rebuttable, it' induces cooperation with Commerce 'without sacrificing the basic purpose of the statute: determining current margins as accurately as possible.'" <u>KYD II</u>, 704 F. Supp. 2d at 1330 (quoting <u>Rhone</u>, 899 F.2d at 1191).

Commerce's presumption "was not rebutted" in the second administrative review. <u>KYD I</u>, 607 F.3d at 767.  "KYD offered no evidence regarding King Pac's activities during the period of review for the second administrative review that would rebut that presumption.  For that reason, Commerce correctly determined that the AFA rate remained relevant to King Pac." <u>Id.</u>  No further demonstration of relevance was required. <u>Id.</u> at 766-67; <u>see also id.</u> at 769 (Dyk, J., concurring in part and dissenting in part) (disagreeing that the <u>Rhone</u> "presumption can be applied without corroborating data for the period of the second administrative review").

In the third administrative review, however, KYD "produced <u>current</u> information" regarding its purchases from King Pac and Master Packaging, <u>KYD I</u>, 607 F.3d at 766 (quoting <u>Rhone</u>, 899 F.2d at 1190). <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at 1325-26 (describing KYD's participation in the administrative review), 1331 n.10 (distinguishing <u>KYD I</u> from <u>KYD II</u> on this basis).  Commerce reasonably concluded that 19 U.S.C. § 1677m(e) did not require use of KYD's price information to determine the export price of each entry. <u>See supra</u> Part IV.C. Nonetheless, that conclusion does not necessarily permit Commerce to wholly disregard this information when corroborating a TAFA rate.

At a minimum, provision of this information obliges Commerce to engage in a more robust evaluation of the 122.88 percent rate as applied to KYD's entries from King Pac.  When relying on "secondary information," Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." KYD II, 704 F. Supp. 2d at 1330 (quoting 19 U.S.C. § 1677e(c)); see also Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, 70 Fed. Reg. 54,711 (September 16, 2005) ("With respect to the relevance aspect of corroboration, [Commerce] will consider information reasonably at its disposal as to whether there are circumstances that would render a margin not relevant."), cited in KYD I, 613 F. Supp. 2d at 1378.  In the second administrative review, pertinent information for King Pac was not available, much less reasonably so. See KYD I, 607 F.3d at 767.  In the third administrative review, however, KYD provided what it contends, and Commerce does not dispute, to be all pertinent information in its possession. See Redetermination at 2; KYD's Comments at 6, 9.

KYD's information suggests that a lower antidumping duty rate would more accurately reflect dumping margins for KYD's imports from King Pac. See infra Part IV.E.  "Commerce's burden is greater where information on the record demonstrates that an alternative rate may be appropriate." Shanghai Taoen Int'l Trading Co. v. United States, 29 CIT 189, 198, 360 F. Supp. 2d 1339 (2005) (citations omitted).  In light of this information, the Rhone presumption is no longer a "common sense inference," KYD I, 607 F.3d at 766 (quoting Rhone, 899 F.2d at 1190), that sufficiently establishes the relevance of the 122.88 percent rate to these entries.

**E**
**Substantial Evidence Does Not Support A Rate of 122.88 Percent For The Entries At Issue**

Commerce's "broad discretion in making antidumping duty determinations . . . is particularly great in the case of uncooperative respondents." <u>Gallant</u>, 602 F.3d at 1323 (citing <u>De Cecco</u>, 216 F.3d at 1032); <u>see also</u> <u>KYD I</u>, 607 F.3d at 765 (citing <u>PAM</u>, 582 F.3d at 1340). That discretion, "however, is not unbounded." <u>Gallant</u>, 602 F.3d at 1323 (citing <u>De Cecco</u>, 216 F.3d at 1032). "The burden imposed by substantial evidence review may not be heavy, but it is not ephemeral. There must be at least enough evidence to allow reasonable minds to differ." <u>PAM</u>, 582 F.3d at 1340 (citations omitted).

"An AFA rate must be 'a <u>reasonably accurate estimate</u> of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to noncompliance.'" <u>Gallant</u>, 602 F.3d at 1323 (quoting and emphasizing <u>De Cecco</u>, 216 F.3d at 1032). "Congress tempered deterrent value with the corroboration requirement. It could only have done so to prevent the petition rate (or other adverse inference rate), when unreasonable, from prevailing and to block any temptation by Commerce to overreach reality in seeking to maximize deterrence." <u>PAM</u>, 582 F.3d at 1340 (quoting <u>De Cecco</u>, 216 F.3d at 1032).

Binding precedent permits Commerce's determination that the antidumping duty rate applied to the entries at issue is <u>reliable</u>. KYD argues that this TAFA rate of 122.88 percent is unreliable in light of post-investigation rates of 2.26 to 5.35 percent and post-review rates of 8.94 to 32.67 percent. <u>See</u> KYD's Memo at 23-31.[18] This argument closely tracks the Federal Circuit's holding that a TAFA rate of 57.64 percent was unreliable in light of post-investigation rates of 5.91 to 6.82 percent and post-review rates of 2.58 to 10.75 percent. <u>See</u> <u>Gallant</u>, 602 F.3d

---

[18] The 8.94 and 32.67 percent rates are the result of the third administrative review. The second administrative review produced rates of 0.80 to 1.87 percent. <u>See</u> <u>KYD I</u>, 607 F.3d at 770 (Dyk, J., concurring in part and dissenting in part).

at 1323-24.  Nonetheless, because "[t]he reliability of an AFA rate is assessed by determining whether the rate was reliable when first used," KYD I, 613 F. Supp. 2d at 1379 (citing Tianjin Mach. Imp. & Exp. Corp. v. United States, 31 CIT 1416, 1434 (2007)), the court is bound by the Federal Circuit's subsequent holding that "Commerce had a sufficient basis for concluding that" this specific rate was reliable when assigning it "in the first administrative review," KYD I, 607 F.3d at 766.

However, in the absence of the Rhone presumption, see supra Part IV.D, substantial evidence does not support—and indeed undermines—the relevance of this rate to the imports at issue.  In other proceedings, Commerce has sought to establish the relevance of its selected AFA rate by identifying individual transactions with dumping rates at or above that AFA rate. See, e.g., PAM, 582 F.3d at 1340 (sales by PAM in the previous period of review); Ta Chen, 298 F.3d at 1339 (a single sale by Ta Chen in the pertinent period of review); Gallant, 602 F.3d at 1324 (sales by exporters other than Gallant in the pertinent period of review).  Such transactions sufficed under the facts of PAM and Ta Chen but did not suffice under the facts of Gallant. See PAM, 582 F.3d at 1340; Ta Chen, 298 F.3d at 1339; Gallant, 602 F.3d at 1324.  Regardless of their sufficiency, these transactions at least existed on the record of those proceedings.  In contrast, the highest transaction-specific rates calculated by Commerce for a cooperative exporter in the instant administrative review are less than 122.88 percent. See Polyethylene Retail Carrier Bags from Thailand—Transaction-Specific Company Margins, U.S. Department of Commerce (January 7, 2009), Confidential Record ("C.R.") 76 at 2 (identifying rates equal to 77 and 88 percent of the selected AFA rate).[19]

---

[19] Because this action is limited to the entries at issue, the court need not determine whether these transaction-specific rates also discredit the use of the 122.88 percent rate to liquidate other entries exported by King Pac or Master Packaging and to collect cash deposits on future exports by these companies. See supra Part IV.A.

KYD's information further undermines the relevance of the 122.88 percent rate.  The chart below is derived from unadjusted and unverified U.S. sales information provided by or for the four mandatory respondents in the third administrative review.[20]  For each transaction, the Y value is the unadjusted U.S. sales price per one thousand bags, and the X value is the approximate volume of material per bag.  The chart does not present a complete picture; for example, each X value directly reflects only four of the thirteen variables used by Commerce to describe the merchandise.  See, e.g., Administrative Review of the Antidumping Duty Order on Polyethylene Retail Carrier Bags from Thailand – Preliminary Results Analysis Memorandum for [Poly Plast], U.S. Department of Commerce (September 2, 2008) ("Poly Plast Memo"), C.R. 67 at 2.[21]

The chart nonetheless suggests a "commercial reality," Gallant, 602 F.3d at 1323, that is inconsistent with a dumping rate of 122.88 percent.  Sales by Poly Plast, which received a "weighted average dumping margin" of 8.94 percent based on "partial adverse facts available," Final Results, 74 Fed. Reg. at 2,511-12, appear to [[ compare in a certain way to ]] those reported by KYD for Master Packaging and King Pac, which each received a TAFA rate of 122.88 percent, id.  This combination of rates and sales prices implies that the normal value of a plastic

---

[20] The court produced this chart using data from submissions to Commerce on behalf of Naraipak, Poly Plast, and KYD. See Letter from Hunton & Williams LLP to U.S. Department of Commerce, Polyethylene Retail Carrier Bags from Thailand (January 25, 2008) ("Naraipak Submission"), C.R. 9 Ex. 24; Letter from Hunton & Williams LLP to U.S. Department of Commerce, Polyethylene Retail Carrier Bags from Thailand ("Poly Plast Submission") (January 25, 2008), C.R. 10 Ex. 20; and Letter from Riggle & Craven to U.S. Department of Commerce (January 25, 2008) ("KYD Initial Submission"), C.R. 11 Ex. FIS-2.  The chart does not distinguish between sales by Master Packaging and sales by King Pac.

[21] The thirteen "characteristics, in order of importance, are: 1) quality, 2) bag type, 3) length, 4) width, 5) gusset, 6) thickness, 7) percentage of high-density polyethylene resin, 8) percentage of low-density polyethylene resin, 9) percentage of low linear-density polyethylene resin, 10) percentage of color concentrate, 11) percentage of ink coverage, 12) number of ink colors, and 13) number of sides printed." Poly Plast Memo, C.R. 67 at 2.  The chart directly reflects length, width, gusset, and thickness.  Furthermore, Poly Plast and Naraipak reported [[ certain product attributes that compare in a certain way ]] . See Naraipak Submission, C.R. 9 Ex. 24; Poly Plast Submission, C.R. 10 Ex. 20.  The high degree of correlation evident from the chart suggests a strong association between the first six variables and normal value.

bag imported by KYD [[ compares in a certain way to ]] the normal value of a similar bag

exported by Poly Plast.  In addition, sales by the Naraipak Group, which received a "weighted

average dumping margin" of 32.67 percent, <u>id.</u>, [[ compare in a certain way to ]] facially similar

sales by Poly Plast, Master Packaging, and King Pac.[22]

---

[22] Commerce states that "the Court appears to assume that normal value would be constant for all U.S. sales." Redetermination at 22 (discussing <u>KYD II</u>, 704 F. Supp. 2d at 1332 n.13).  Commerce's belief is incorrect. The court's observation that "[u]se of total adverse facts available could produce antidumping duties that are highest when the actual margin of dumping is lowest (or nonexistent)" concerns sales at different prices of identical or substantially similar products. <u>See</u> <u>KYD II</u>, 704 F. Supp. 2d at 1332 n.13 (positing "<u>certain merchandise</u> [with] a constant normal value of $10") (emphasis added); <u>see also</u> Poly Plast Memo, C.R. 67 at 2 ("If no identical match was found, we matched the similar merchandise on the basis of the comparison-market model which was closest in terms of the physical characteristics to the model sold in the United States"); Administrative Review of the Antidumping Duty Order on Polyethylene Retail Carrier Bags from Thailand – Final Results Analysis Memorandum for [Poly Plast], U.S. Department of Commerce (January 7, 2009), C.R. 74 at 25 (comparing "identical products" as well as "similar products"); February 9, 2011 Oral Argument at 12:25:25-12:33:04.

[[ This chart, which compares U.S. sales data submitted by

KYD (for purchases from King Pac and Master Packaging),

Poly Plast, and Naraipak Group, has been redacted as confidential. ]]

The record evidence necessarily informs the court's review of Commerce's selection of a

122.88 percent antidumping duty rate for the entries at issue. See Gallant, 602 F.3d at 1323

("[The] court reviews the record as a whole, including any evidence that 'fairly detracts from the

substantiality of the evidence,' in determining whether substantial evidence exists.") (quoting

Micron Tech, 117 F.3d at 1393).[23]  The only apparent evidence supporting that rate originates in

the 2003 petition. See KYD II, 704 F. Supp. 2d at 1326; see also Initiation of Antidumping Duty

Investigations: Polyethylene Retail Carrier Bags from The People's Republic of China, Malaysia,

---

[23] Although Commerce is better positioned than the court to analyze KYD's information, see De Cecco, 216 F.3d at 1032, it has so far declined to do so in this matter.

and Thailand, 68 Fed. Reg. 42,002, 42,004 (July 16, 2003) ("Based on comparisons of export price to normal value" provided in the 2003 petition, "the estimated dumping [rates] for [subject merchandise] from Thailand range from 34.84 percent to 122.88 percent.").  That evidence amounts to no "more than a mere scintilla," Ad Hoc Shrimp, 618 F.3d at 1321.  Far from supporting a finding of relevance, the record as a whole strongly suggests that a rate of 122.88 percent has no relationship to the actual entries at issue in this third administrative review.[24]


**V**

**CONCLUSION**

For the reasons stated above, this matter is REMANDED to Commerce for action consistent with this opinion.


                                        __/s/ Evan J. Wallach_____
                                        Evan J. Wallach, Judge

Dated:  April 28, 2011
        New York, New York

---

[24] The court need not address KYD's Eighth Amendment claim. See KYD's Comments at 26-29.  A statutorily proper AFA rate is remedial rather than punitive, KYD I, 607 F.3d at 767-78, and a "punitive" rate is statutorily improper, Gallant, 602 F.3d at 1323 (quoting De Cecco, 216 F.3d at 1032).

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
KYD, INC.,                              :
                                        :
            Plaintiff,                  :
                                        :     Before:      WALLACH, Judge
      v.                                :     Court No.:   09-00034
                                        :
UNITED STATES,                          :
                                        :
            Defendant,                  :
                                        :
      and                               :
                                        :
POLYETHYLENE RETAIL CARRIER             :
BAG COMMITTEE, HILEX POLY CO.,          :
LLC, and SUPERBAG CORPORATION,          :
                                        :
            Defendant-Intervenors.      :
_____:

## **ORDER**

This case having come before the court upon the Final Results of Redetermination filed by the U.S. Department of Commerce; the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED that this matter is REMANDED to the U.S. Department of Commerce for action consistent with the opinion accompanying this order ("the Opinion"); and it is further

ORDERED that all parties shall confer and submit, jointly if possible, no later than May 27, 2011 a proposed schedule for submission of the second remand determination, responses to that determination, and replies to those responses; and it is further

ORDERED that each party shall review the Opinion and shall in writing no later than May 4, 2011 notify the court whether any information contained in the Opinion is confidential,

identify any such information, and request the deletion of any such information from the public version of the Opinion to be issued thereafter.  If a party determines that information is confidential, it shall propose alternate language to replace such information.  If a party determines that no information is confidential, it shall so notify the court in writing no later than May 4, 2011.


                                             __/s/ Evan J. Wallach_____
                                             Evan J. Wallach, Judge

Dated: April 28, 2011
       New York, New York

2